UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------x
                                                 :

RYAN STEPHENSON
                                                 :

    - against -                              :        Case No.

UNITED STATES OF AMERICA

                Defendant.
----------------------------------x

# PETITION FOR A WRIT OF ERROR *CORAM NOBIS*

PETRILLO KLEIN & BOXER LLP
655 Third Avenue, 22nd Floor
New York, New York 10017
(212) 370-0330

-and-

TALKIN, MUCCIGROSSO & ROBERTS LLP
40 Exchange Place, 18th Floor
New York, NY 10005
(212) 482-0007

November 18, 2019        *Attorneys for Petitioner Ryan Stephenson*

Petitioner Ryan Stephenson, through his undersigned attorneys, submits this petition for a writ of error *coram nobis* to vacate his conviction and sentence entered on May 24, 1999 in the U.S. District Court for the Southern District of New York by the Honorable Kimba M. Wood in the matter captioned *United States v. Stephenson*, No. 98 Cr. 637.[1]

**PRELIMINARY STATEMENT**

1. Mr. Stephenson, a citizen of the United Kingdom, is a fifty-one-year-old, gainfully employed father of four and grandfather of six who has lived legally in the United States since he was two years old.

2. Two decades ago, Mr. Stephenson was charged with bank fraud, forgery, and conspiracy arising out of an alleged scheme to steal checks from the mailroom of his former employer, Gruntal & Co. Incorporated ("Gruntal").[2]

3. Before trial, the U.S. Attorney's Office for the Southern District of New York offered to drop two of the charges against Mr. Stephenson and allow him to plead guilty to a single conspiracy count.

4. The government advised Mr. Stephenson that, should he forgo the plea, he could lose at trial, spend five years in jail, and subsequently be deported. Conversely, if he took the plea, he would serve a few months in prison before "resum[ing] a normal life."

5. Following the meeting, Mr. Stephenson asked his court-appointed attorney, George Goltzer, whether it was true that if he proceeded to trial and lost, that he would be deported; whereas if he pled guilty, he would serve a short jail sentence and then "everything

---

[1] All citations to an "Ex." are to an exhibit attached to the Declaration of Theresa Gue in Support of Petitioner's Motion for a Writ of Error *Coram Nobis*, dated November 15, 2019 ("Gue Dec.").

[2] Aside from this single aberration, Mr. Stephenson has no criminal record.

2

would go back to normal."

6. Mr. Goltzer confirmed the truth of the government's representations, reassured Mr. Stephenson that if he accepted the plea deal, he could in short order "resume a normal life," and urged Mr. Stephenson to consider the deal.

7. Though Mr. Stephenson believed that there were significant weaknesses in the government's case, in order to avoid the risk of being deported and separated from his family, he accepted the deal, pled guilty, and was sentenced to five months' imprisonment and two years of supervised release.

8. At no time during the remaining proceedings in the case—including signing the plea agreement, pleading guilty, and sentencing—did anyone, including counsel, inform Mr. Stephenson that his guilty plea could affect his immigration status.

9. On Mr. Stephenson's prison release date, he was told by an immigration official that there was no immigration detainer on him and that he could return home.

10. Mr. Stephenson thereafter returned to his family and resumed his life, entirely unaware that he was at risk of deportation.

11. Fifteen years later, Mr. Stephenson was stopped at John F. Kennedy Airport on his return from a vacation abroad and learned—in direct contradiction to the advice he received from counsel—that he was subject to deportation.

12. Mr. Stephenson now faces being deported from the only country he has ever known, and being separated from his home, children, grandchildren, fiancé, and mother—the exact outcome that the government and Mr. Goltzer promised Mr. Stephenson would *not* happen should he plead guilty.

13. Mr. Goltzer's affirmative misrepresentations regarding the deportation

consequences of the guilty plea constitute ineffective assistance of counsel.

14. Mr. Stephenson was prejudiced because had he known that he could be deported even after pleading guilty, he would have rejected the government's plea offer and insisted that his counsel negotiate a plea with no immigration consequences or, barring that, would have proceeded to trial.

15. Mr. Stephenson's petition is timely because he filed it within months of learning of this potential avenue for relief, while simultaneously challenging his removal directly in immigration court.

16. Deportation and a subsequent bar from reentry against Mr. Stephenson constitute continuing legal consequences that may be remedied by granting the writ.

## BACKGROUND

### I. Mr. Stephenson's Home in the United States

17. Mr. Stephenson was born in 1968 in the United Kingdom. When he was two years old, he immigrated to the United States with his mother and his brother, while his father and another brother remained in the United Kingdom for legal reasons. His sister was later born in the United States.

18. Mr. Stephenson attended high school in Queens and Brooklyn and graduated in 1988. Following his graduation, he held a number of jobs, including opening a neighborhood bar with his mother and managing a shoe store.

19. In or about 1995, he began to work various jobs through a temporary placement agency, eventually being placed in a temporary role at Gruntal. After working at Gruntal for several months, in 1996, Mr. Stephenson was hired to work there full-time and promoted to head of the mailroom.

20. Mr. Stephenson was fired by Gruntal in 1998 after being accused of stealing checks from the mailroom.

21. On the basis of his lawyer's advice that he would not be subject to any immigration consequences—discussed in greater detail below—Mr. Stephenson subsequently pled guilty and served five months' imprisonment.

22. Following his release, Mr. Stephenson worked at a proxy services company for four years, at HBO for five years, and at Chanel for two-and-a-half years, where he ran the office services department, the mailroom, and the conference center. While working by day, Mr. Stephenson attended the College of New Rochelle by night and, after four years, received his Bachelor of Arts in Communications in 2015.

23. In 2014, Mr. Stephenson began working for the Office of Food and Nutrition Services in Brooklyn, handling staffing, logistics, and payroll for several of the city's public school cafeterias. The new job afforded him a reduced commute and summer vacation, which enabled him to spend more time with his family, especially his two young children. Since 1998, Mr. Stephenson has volunteered as a counselor at Freedom School and the Glenwood Houses in Brooklyn, where he works with community youth.

24. Mr. Stephenson has four children, ages 30, 28, 10, and 5. At the time of his guilty plea, the eldest two children lived with Mr. Stephenson. Currently, the youngest two children live with Mr. Stephenson and depend on him financially.

25. Mr. Stephenson is also active in the lives of his six grandchildren, all of whom live in the United States.

26. Mr. Stephenson has been engaged to a U.S. citizen, Judith Benjamin, for five years. They are currently saving up to marry and move in together.

## II. The Underlying Criminal Allegations

27. Mr. Stephenson was head of the mailroom at Gruntal from 1996 to 1998.

28. In May 1998, he was called into a meeting with a compliance officer at Gruntal and asked if he had stolen company checks. Mr. Stephenson denied the allegations.

29. In the next few weeks, Mr. Stephenson met with U.S. Postal Inspectors without counsel on approximately five occasions, voluntarily answering their questions and submitting 9 pages of fingerprint and palm print samples and 130 pages of handwriting samples. Ex. A (Letter from Kietta T. Lockerman).

30. Despite the vast set of samples gathered by the Postal Service, there is no evidence that Mr. Stephenson's fingerprints or handwriting matched any of the evidence gathered by the government. In fact, the only available forensic test results reveal that the fingerprints on one of the stolen checks did *not* match Mr. Stephenson's prints. Ex. A at 15.

31. On July 6, 1998, the government unsealed an indictment charging Mr. Stephenson with bank fraud conspiracy in violation of 18 U.S.C. § 371, bank fraud in violation of 18 U.S.C. § 1344, and fraudulent endorsement of checks in violation of 18 U.S.C. § 513. The only overt acts relating to Mr. Stephenson alleged in the indictment were that "in or about March 1997 [he] stole checks from the mailroom of Gruntal & Co. Incorporated, located at 77 Water Street, New York, New York" and that "in or about March 1997 [he] placed telephone calls to [defendants] Sherwin Noel" and "Prince Michael Alston." Ex. B (Indictment) ¶ 4a & ¶ 4b.

32. On the day the indictment was unsealed, Mr. Stephenson voluntarily surrendered to the government, and Mr. Goltzer was appointed by the Court to represent him.

33. On December 17, 1998, a grand jury returned a superseding indictment, which was substantially similar with respect to its allegations against Mr. Stephenson.

6

34. From the record, it appears that the only evidence the government had against Mr. Stephenson was the testimony of a cooperating witness and a statement from co-defendant Lesmine Williams that she received checks from a black male from England. Mr. Stephenson believed he could attack the credibility of both witnesses, particularly Williams, who initially stated that a white male named Peter Kraft provided her with the checks, but wholly revised her story during a second interview.

35. Mr. Stephenson reasonably believed that the government lacked evidence to corroborate the cooperating witness's testimony. He was eager to cross-examine the government's witnesses and challenge its case at trial, a desire that he repeatedly expressed to Mr. Goltzer.

36. Although Mr. Goltzer was aware that Mr. Stephenson was not a U.S. citizen, he did not advise Mr. Stephenson of any immigration consequences arising from a potential conviction, aside from a February 1999 conversation in which he incorrectly advised Mr. Stephenson about the differing immigration consequences of accepting a plea offer versus losing at trial.

### III. The Erroneous Legal Advice Mr. Stephenson Received from Prior Counsel

37. Two weeks prior to trial, in approximately mid-February 1999, the government invited Mr. Stephenson and his counsel to come in for a "reverse proffer" session. During the session, an Assistant United States Attorney ("AUSA")[3] offered Mr. Stephenson a plea deal dropping two of the three counts against him and requiring him to plead guilty to a single conspiracy count, with a deadline that expired in forty-eight hours. The government told Mr. Stephenson that should he proceed to trial and lose, he would have to serve five years in prison

---

[3] Mr. Stephenson no longer remembers the name of this AUSA.

and then would be deported. In contrast, if he instead took the plea deal, he would be imprisoned for a few months, serve a period of supervised release, and then "resume a normal life."

38. This meeting was the first time Mr. Stephenson heard of potential immigration consequences and realized he could be deported. Mr. Stephenson recalls feeling "blindsided."

39. Following the meeting, Mr. Stephenson privately questioned Mr. Goltzer on the accuracy of the government's representations. Because deportation was now at the forefront of his mind, Mr. Stephenson specifically asked Mr. Goltzer whether it was true that if he proceeded to trial and lost, he would be deported. Mr. Goltzer answered yes. Mr. Stephenson then asked whether if he were to take the plea, after he served the jail time, everything would go back to normal, and he would be able to come home to his family. Mr. Goltzer confirmed that if he accepted the plea deal, Mr. Stephenson could, as the AUSA said, "resume a normal life" following a short term of incarceration. Mr. Goltzer further urged Mr. Stephenson to consider taking the government's offer in order to put the whole incident behind him.

40. Mr. Stephenson left the meeting understanding that should he choose to take the plea, he would be safe from deportation.

41. Mr. Stephenson took the next forty-eight hours to consider the government's offer. His mother advised him to think of his children—who would lose their home and father if Mr. Stephenson were to be deported—and to take the plea.

42. Mr. Stephenson believed he could win at trial, but was deeply concerned about being deported and separated from his family and his home. The risk was simply too great. Mr. Stephenson decided to plead guilty in order to ensure that he would not be deported and informed Mr. Goltzer of his decision. The two had a substantive discussion about the consequences of pleading guilty, during which Mr. Goltzer again failed to warn Mr. Stephenson

that he could be deported as a result of pleading guilty.

43. Had Mr. Stephenson known that he could be deported even after pleading guilty, he would have insisted that his counsel negotiate a plea without immigration consequences. If that was not possible, he would have rejected the plea offer and proceeded to trial.

### IV. No Discussion of Immigration Consequences in the Plea Agreement or Court Proceedings

44. On February 3, 1999, Mr. Stephenson entered into a plea agreement with the government, and on February 22, 1999, Mr. Stephenson pled guilty to Count One of the Superseding Indictment, a violation of 18 U.S.C. § 371. Mr. Stephenson does not recall the plea agreement making any mention of potential immigration consequences. Similarly, there was no mention of immigration consequences in court during the plea allocution.

45. On April 13, 1999, the Probation Office filed a Presentence Investigation Report ("PSR") with the Court. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

46. The PSR's description of the offense conduct with regard to Mr. Stephenson was uncorroborated, summary, and internally inconsistent. The PSR made two factual allegations against Mr. Stephenson. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

47. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

[redacted]

48. On May 24, 1999, Mr. Stephenson was sentenced by Judge Kimba M. Wood to five months' imprisonment followed by two years of supervised release. Mr. Stephenson does not recall any mention of immigration consequences occurring during his sentencing.

49. Judgment was entered on May 26, 1999. Judge Wood recommended to the Bureau of Prisons that Mr. Stephenson be imprisoned "near the New York City area, so that he may be near his family." Ex. I at 2.

50. Mr. Stephenson was jailed at the Metropolitan Detention Center ("MDC") in Brooklyn. His family came to visit him weekly during his imprisonment.

## V. The Assurance Mr. Stephenson Received from Immigration Officials that He Would Not be Deported.

51. While serving time at the MDC, Mr. Stephenson witnessed inmates who had finished serving their sentences being detained by immigration officials on their release dates for potential deportation. Mr. Stephenson then realized that he could be deported even after serving his sentence.

52. He immediately met with an immigration official at the jail and was told that deportation depended on a number of factors, including the severity of the case, how long an individual has been in the country, whether he has been paying taxes, and whether he has children. Mr. Stephenson regularly followed up with the same official to discuss his case.

53. At the completion of his sentence, Mr. Stephenson met with the same official and was told that the office would not detain him for deportation proceedings. Mr. Stephenson was never informed that his immigration status could be revisited, nor was he warned to limit his travel in any way. As a result, Mr. Stephenson reasonably believed that he was free to go home and resume his life, consistent with the advice he had been given by his attorney.

54. Mr. Stephenson thereafter resumed a normal life, which included traveling internationally on vacation several times without incident.

55. The immigration consequences of Mr. Stephenson's plea did not become apparent until 2014, when he was stopped at John F. Kennedy Airport upon returning to the United States and told that he had a problem with his immigration status arising from a prior arrest.

## VI. Mr. Stephenson's Efforts to Seek Relief

56. Lacking the funds to pay for a lawyer and not appreciating the severity of his situation, Mr. Stephenson decided to represent himself in immigration court during several hearings until a judge recommended that he seek counsel and informed him that he could obtain representation on a *pro bono* basis.

57. In 2017, Mr. Stephenson retained Stacy Lam of the Legal Aid Society to represent him in immigration proceedings.

58. In 2019, Ms. Lam, who does not specialize in criminal law, consulted with a colleague at Legal Aid and learned for the first time that Mr. Stephenson could fight deportation proceedings collaterally by filing a petition for writ of error *coram nobis*. Ms. Lam reached out to Petrillo Klein & Boxer LLP for assistance.

59. Mr. Stephenson filed the instant petition a few months later, within five months of first learning of the remedy and while simultaneously appealing the immigration court's ruling

that he was deportable to the Board of Immigration Appeals.

## PRAYER FOR RELIEF

60. For the foregoing reasons, Mr. Stephenson respectfully asks that the Court issue a writ of error *coram nobis* vacating his conviction and sentence and grant such further relief as the Court deems just and proper.

Dated: November 18, 2019
       New York, New York

Respectfully submitted,

PETRILLO KLEIN & BOXER LLP

By: /s/ Theresa H. Gue

Theresa H. Gue
655 Third Avenue, 22nd Floor
New York, New York 10017
Telephone: (212) 370-0330
Facsimile: (212) 370-0391

-and-

TALKIN, MUCCIGROSSO & ROBERTS LLP
Noam Greenspan
40 Exchange Place, 18th Floor
New York, NY 10005
Telephone: (212) 482-0007
Facsimile: (212) 482-1303
*Attorneys for Petitioner Ryan Stephenson*